# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **EASTERN MAINE MEDICAL CENTER,** | ) ) ) | |
| PLAINTIFF | ) ) | |
| v. | ) ) | CIVIL NO. 1:14-cv-382-DBH |
| **SYLVIA BURWELL,** *Secretary of United States Department of Health and Human Services,* | ) ) ) ) ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

This case presents two questions. Does section 5504(c) of the Patient Protection and Affordable Care Act ("ACA"), enacted in 2010, require the Secretary of Health and Human Services to apply the Act's new provisions to hospital cost reimbursements for 2003 and 2004 because a hospital still had an appeal pending as to those two years in 2010? If not, has the Secretary properly applied earlier law concerning required documentation for a hospital's request for reimbursement for its offsite graduate medical education training? The earlier law allowed Medicare reimbursement for such training if the hospital incurred "all, or substantially all" the costs of the offsite training program. 42 U.S.C. §§ 1395ww(d)(5)(B)(iv) (2003), 1395ww(h)(4)(E) (2004). The ACA is more precise and allows reimbursement for offsite training simply "if a hospital incurs

the costs of the stipends and fringe benefits of the resident." 42 U.S.C. § 1395ww(h)(4)(E)(ii) (2012). I conclude that the ACA's new provisions do not apply to a previous cost reimbursement request, even though that request was still under appeal when the ACA was enacted. I also conclude that the Secretary properly applied the previous law and regulations. Accordingly, the plaintiff hospital's Motion for Judgment on the Administrative Record (ECF No. 19) is **DENIED,** and the defendant Secretary's Cross-Motion for Judgment on the Administrative Record (ECF No. 22) is **GRANTED**.

### FACTUAL BACKGROUND[1]

Eastern Maine Medical Center ("EMMC") is a nonprofit, short-term, acute care hospital in Bangor, Maine. R. at 24. EMMC has maintained a family practice residency program of graduate medical education since 1975. Id. at 142-43. EMMC obtains Medicare reimbursement for a share of the direct and indirect costs associated with operating this residency program. The program involves 52 week-long rotations for each of three years. Rotations taking place entirely on the hospital's campus are known as "inside rotations." Id. at 144-45. Rotations occurring partially or entirely off campus are called "outside rotations." Id. at 145. The hospital has used outside rotations in its graduate medical education program since the beginning. Id. Traditionally, off-campus physicians agree to supervise EMMC's medical residents in patient care activities off campus without compensation for their supervisory role. Id. at 24. For the years in dispute (fiscal years 2003 and 2004), some of these agreements were written,

---

[1] Citations to the administrative record are reflected as "R. at [page number]."

others were not, and some agreements were not signed until after the residency began.  Id.

## PROCEDURAL HISTORY

The Secretary uses the Centers for Medicare and Medicaid Services to administer Medicare and Medicaid programs.  Id. at 2.  The parties also call it "CMS" or "the Administrator" or "the CMS Administrator."  I shall call it "the CMS Administrator."  The CMS Administrator contracts with "Fiscal Intermediaries"[2] to manage hospital reimbursement and auditing functions for Medicare-approved graduate medical education reimbursements.  Id. at 2-3, n.1.  A Fiscal Intermediary's ruling is appealable to a Provider Reimbursement Review Board under 42 U.S.C. § 1395oo(a).  Id. at 2.  The statute provides that the Board's ruling is in turn reviewable by the Secretary acting through the CMS Administrator.  42 U.S.C. § 1395oo(f).  That final decision is reviewable in federal court under 5 U.S.C. §§ 701-706, the Administrative Procedure Act.

### (1) Fiscal Intermediary's Decision

In this case, after auditing EMMC's outside rotation schedules and agreements in connection with a reimbursement request for the family practice residency educational program, the Fiscal Intermediary disallowed many of the outside rotations for fiscal years 2003 and 2004.  R. at 24.  (Disallowance results in reduced Medicare reimbursements to the hospital.)  EMMC then provided additional documentation, and the Fiscal Intermediary made adjustments,

---

[2] That was the term in use at the times in question.  Now they are known as Medicare Administrative Contractors.

3

allowing more, but not all, of the rotations.  Id. at 24-25.  Rotations were disallowed because there was no signed agreement with the volunteer physician, the agreement was signed after the rotation took place, or the compensation arrangement with the supervising volunteer physician was not "properly documented."  Id.  EMMC thereafter conceded that some, but not all, of the remaining rotations were appropriately disqualified by the Fiscal Intermediary. Id.  As for the rest, EMMC appealed the Fiscal Intermediary's ruling to the Provider Reimbursement Review Board.  Id. at 2.

### (2) Provider Reimbursement Review Board Hearing

The Board held a live testimonial hearing, reviewed the Fiscal Intermediary's findings on the remaining challenged rotations, and concluded that the findings conflicted with the 2010 Affordable Care Act, under which compensation for the outside teaching physician is no longer relevant.  The Board ruled that for "jurisdictionally proper pending appeals as of the date of the enactment" of the ACA, section 5504(c) of that Act[3] and the Secretary's implementing regulation (42 C.F.R. § 413.78(g)(6)) require that the new, more lenient reimbursement provisions (i.e., that the hospital can obtain reimbursement if it simply pays the resident's stipend and fringe  benefits) of section 5504(a) and (b) apply.  Id. at 3.  The Board therefore ordered the Fiscal Intermediary to apply the provisions of section 5504 to EMMC's disallowed

---

[3] ACA section 5504(a) and (b) is codified at 42 U.S.C. § 1395ww(h)(4)(E), while ACA section 5504(c) appears in a note titled "Construction of 2010 Amendment" in the same section of the Code.  Like the parties, I will refer to it as "section 5504" rather than by its location in the United States Code.

rotations, id. at 4, which would result in greater Medicare reimbursement to EMMC.[4]

### (3) CMS Administrator Review

At the Fiscal Intermediary's request, the CMS Administrator, acting on the Secretary's behalf, reviewed the Board's decision.   Id. at 2.   The CMS Administrator disagreed with the Board's interpretation that section 5504(c) and its implementing regulation required retroactive application of the new standards to pending appeals.  Id. at 25.

The CMS Administrator then analyzed EMMC's disallowed outside rotations under the law as it stood before passage of the ACA.  Id. at 25-29.  The CMS Administrator ruled that in order for outside rotations to qualify for reimbursement, 42 C.F.R. § 413.86(f) required that a written agreement with the off-campus physician specify the amount of compensation paid for supervisory teaching activities (even if EMMC did not pay the compensation).  Id. at 27. Furthermore, the CMS Administrator ruled that the agreement must be in writing before the resident's rotation began.  Id.  The CMS Administrator declared:

> [W]here this is no agreement, no timely agreement, or fully executed timely agreement, [EMMC] has failed the requirement of a timely executed written agreement. . . . Where the supervisory physician is a volunteer, the appropriate documentation must be provided on the physicians' salaried or compensation basis, or else the regulatory documentation requirement, inter alia, that [EMMC] incur all or substantially all of the costs are not met.

---

[4] As a result, the Board never ruled on the propriety of the Fiscal Intermediary's application of the pre-ACA statute and regulations.  No one has suggested that a remand for such a ruling by the Board is required.

> Thus, the Intermediary's exclusion of the disallowed
> [rotations] was proper.

Id. at 28-29.[5]  As a result, the CMS Administrator reversed the findings of the

Provider Reimbursement Review Board and reinstated the findings of the

Intermediary.  Id. at 29.

EMMC appealed the CMS Administrator's decision to this court under 42

U.S.C. § 1395oo(f)(1), which provides for judicial review of Medicare Provider

Reimbursement Review Board decisions (or Board decisions which have been

modified by the Secretary through the CMS Administrator) according to the

terms of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Both

EMMC and the Secretary have filed cross-motions for judgment on the

administrative record.  EMMC asks this court to reinstate the Board's decision,

while the Secretary urges the court to affirm the CMS Administrator's decision.

## ANALYSIS

### (1) Standard of Review

The APA states that a reviewing court shall "hold unlawful and set aside

agency action, findings, and conclusions found to be arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," or "unsupported

by substantial evidence in the administrative record."  5 U.S.C. § 706(2)(A) and

(E).  See also South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 97 (1st Cir.

---

[5] The CMS Administrator went on to recognize that a 2004 moratorium passed by Congress altered the reimbursement structure for off-site graduate medical education somewhat. However, the CMS Administrator ruled that while the moratorium allowed hospitals to count (for reimbursement purposes) residents training in off-campus settings without regard to the financial arrangement between the hospital and teaching physician, the moratorium did not eliminate the requirement that a written agreement be signed before the outside rotation took place.  R. at 29.  EMMC has not attacked that particular decision.

2002). Under the APA's arbitrary and capricious standard, "agency action is presumptively valid," and the standard "precludes a reviewing court from substituting its own judgment for that of the agency." <u>Rhode Island Hosp. v. Leavitt</u>, 548 F.3d 29, 33-34 (1st Cir. 2008). Nevertheless, a court should not uphold agency action that contradicts the "unmistakably clear expression of congressional intent." <u>Id</u>. at 34 (quoting <u>Strickland v. Comm'r</u>, 48 F.3d 12, 16 (1st Cir. 1995)).

### *(2) Adequacy of Notice*

The regulation that authorizes CMS Administrator review of a Provider Reimbursement Review Board decision, 42 C.F.R. § 405.1875(c)(3)(i), states that the CMS Administrator "must send a written notice to the parties, CMS, and any other affected nonparty stating that the Board's decision is under review, and *indicating the specific issues that are being considered*" (emphasis added). EMMC protests that the notice here failed to identify which "specific issues" were being reviewed, that it did not allow the hospital "to comment with specificity" on the issues being reviewed, that the hospital "was left to guess" as to the nature of the review, and that it "could only provide broad, general comments in response to a broad and general Notice." Pl.'s Mot. for J. on the Admin. R. (ECF No. 19) ("Pl.'s Mot.") at 25. EMMC asserts that the notice's defect constitutes a deprivation of due process and that the CMS Administrator's decision upon review cannot be upheld. <u>Id</u>. at 26.

EMMC cites <u>Maine Medical Center et al. v. Sebelius</u>, No. 2:13-cv-309-NT (D. Me. Sept. 24, 2015),[6] as precedent for declaring the CMS Administrator's notice defective here.  That case involved Fiscal Intermediary letters stating that cost reports from certain years were being reopened to "review and correct the [Medicare Disproportionate Share Hospital] payment calculation in accordance with" the Medicare statute and regulations.  <u>Id</u>. at 5.  Magistrate Judge Rich agreed with the hospital plaintiffs that the vague letters provided no indication as to "which of the many aspects of the [Disproportionate Share Hospital] payment was to be examined" and that the process essentially deprived the hospitals of "the opportunity to comment, object, or submit evidence" in support of their position.  <u>Id</u>. at 17.

The CMS Administrator's notice in this case and its context are quite different.  The notice here stated:

> [T]he Administrator, Center for Medicare & Medicaid Services (CMS) will review the above captioned PRRB decision*, involving whether the Medicare Administrative Contractor [i.e. the Fiscal Intermediary] erred by excluding outside rotations from the Provider's Graduate Medical Education and Indirect Medical Education full time equivalent count.  The Intermediary submitted comments, recommending that the Administrator review and reverse the Board's decision in the case.*  The review of this decision will involve whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments.  The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.  The regulation published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board.  You have

---

[6] In the <u>Maine Medical Center</u> case, Chief Judge Torresen adopted in full the Recommended Decision on Cross-Motions for Judgment on Administrative Record by Magistrate Judge Rich, No. 2:13-cv-309-NT (ECF No. 26).  All citations to this case are to Magistrate Judge Rich's Recommended Decision. Judge Torresen's order can also be found at <u>Maine Medical Center v. Burwell</u>, No. 2:13-cv-309-NT, 2015 WL 5656060 (D. Me. Sept. 24, 2015).

> a right to submit comments within 15 days of your receipt of
> this letter.

R. at 44 (emphasis added).[7]  Specifically, outside rotations were the issue, the CMS Administrator was responding to the Fiscal Intermediary's comments that requested reversal of the Board's decision, and the CMS Administrator would consider the "laws, regulations and other criteria cited by the Board and by the parties in their comments."  The CMS Administrator's review was in fact the *third* review in this case.  EMMC began its appeal of the Fiscal Intermediary's initial adjustments no later than March 2006.  Id. at 2,502.  The Fiscal Intermediary submitted its position paper explaining why it made its adjustments to EMMC's rotations on October 16, 2006.  Id. at 2,255.  Except for the Affordable Care Act retroactivity question, the issues did not change between then and June 2014 when the CMS Administrator exercised its option to review the Board decision. EMMC's comments to the CMS Administrator were comprehensive, R. at 31-36, and even expressly incorporated some of its past filings with the Board addressing issues beyond its comments.  Id. at 35.  EMMC has identified no issue or sub-issue in the CMS Administrator's decision that it did not fully brief, either by its direct comments during the CMS Administrator's review or by those incorporated from earlier in the appeals process.  Id. at 2-30.[8]  In short, EMMC was not caught off-guard by the issues the CMS Administrator addressed, and

---

[7] The Secretary concedes that this notice "did not list all of the sub-issues encompassed by the issue it identified," Def.'s Mot. for J. on the Admin. R. (ECF No. 22) ("Def.'s Mot.) at 18, but for the reasons stated in text, I am satisfied that the notice passed muster.

[8] EMMC complains that the deadline for submitting comments was the same for all parties, fifteen days after receipt of the notice, but it has not referred to any specific comment that raised a new issue to which it was then unable to respond.

the notice was sufficient.  To reverse the Secretary's decision here on the basis of insufficient notice would elevate form over substance.[9]

### (3) *Retroactivity of the Affordable Care Act Section 5504*

I now analyze EMMC's first substantive argument, that ACA section 5504 and its implementing regulation require reversal of the CMS Administrator's decision.  EMMC wants the new ACA provisions to apply to its 2003 and 2004 cost reports, new provisions that are unconcerned with how teaching physician volunteers are paid on outside rotations.  Specifically, the Affordable Care Act states:

> Effective for cost reporting periods beginning on or after July 1, 2010, all of the time so spent by a resident shall be counted toward the determination of full-time equivalency, *without regard to the setting in which the activities are performed, if a hospital incurs the costs of the stipends and fringe benefits of the resident during the time the resident spends in that setting.*

Section 5504(a)(emphasis added).[10]   Since EMMC incurs the cost of the residents' stipends and fringe benefits, that ACA provision would allow EMMC to

---

[9] EMMC asks me to reverse the Secretary's decision and reinstate the Board's decision because of inadequate notice.  Pl.'s Mot. for J. on the Admin R. (ECF No. 19) ("Pl.s' Mot.") at 27.  But if the notice were inadequate, I would remand for proper notice and a decision by the CMS Administrator.  EMMC has given no reason to conclude that a different decision would result from a more specific notice.  The burden for showing harm from an agency procedural error ordinarily falls on the party appealing the agency's action.  See United States v. Coal. for Buzzards Bay, 644 F.3d 26, 37 (1st Cir. 2001).  Although EMMC complains that it was forced to engage in a "buckshot" approach in its briefing, it provides no concrete evidence that it was deprived of making any specific argument on any issue or sub-issue before the CMS Administrator.  The APA instructs courts to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706.   "The doctrine of harmless error is as much a part of judicial review of administrative action as of appellate review of trial court judgments."  Save Our Heritage, Inc., v. F.A.A., 269 F.3d 49, 61 (1st Cir. 2001).  Because any flaw in the CMS Administrator's Notice lacked prejudicial error and "remand 'would accomplish nothing beyond further expense and delay,'" EMMC's argument on this point fails.  Id. (quoting Kerner v. Celebrezze, 340 F.2d 735, 740 (2d Cir. 1965)).

[10] Subsection (a) deals with direct costs; subsection (b) deals with indirect costs and is to the same effect.

10

obtain reimbursement for its outside rotations without concern about the written agreements and compensation arrangements with outside teaching physicians.

The first problem for EMMC is that this provision states specifically that it applies to cost reporting periods beginning on or after July 1, 2010, whereas EMMC is contesting fiscal years 2003 and 2004.  For those years, the "all, or substantially all" standard of costs explicitly still applies.  Even after the ACA amendments, the statute states:

> Effective for cost reporting periods beginning *before* July 1, 2010, all the time so spent by a resident under an approved medical residency training program shall be counted towards the determination of full-time equivalency, without regard to the setting in which the activities are performed, if the hospital incurs *all, or substantially all, of the costs for the training program in that setting* . . . .

42 U.S.C. § 1395ww(h)(4)(E)(i) (emphasis added).  However, EMMC points to subsection (c) of section 5504, which provides that the new standard of section 5504 "shall not be applied in a manner that requires reopening of any settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending" as of the date of the ACA's enactment.  (The implementing regulation has similar language.[11])  EMMC argues that this language only prohibits the new standard from being applied in a manner that reopens reports where there is no proper appeal pending.  Since EMMC had an appeal pending when the ACA was enacted in 2010, it argues that the text of the statute and the regulation *requires* that the new standard of section 5504 be applied to its case.  Pl.'s Mot. at 27-33.

---

[11] The relevant language of 42 C.F.R. § 413.78 states that it "cannot be applied in a manner that would require the reopening of settled cost reports, except those cost reports on which there is a jurisdictionally proper appeal pending on direct [Graduate Medical Education] or [Indirect Medical Education] payments as of March 23, 2010."  79 Fed. Reg. 50,118 (Aug. 2014).

According to the First Circuit, when there is no First Circuit guidance, "comity and common sense suggest" that I "should not discard [the] insights [of another Circuit]." Communications Workers of America, AFL-CIO v. Western Elec. Co., Inc., 860 F.2d 1137, 1141 (1st Cir. 1988). In this case, I cannot improve upon the reasoning of the Sixth Circuit, which recently confronted the identical question in Covenant Medical Center, Inc. v. Burwell, 603 F. App'x 360 (6th Cir. 2015). There, the Sixth Circuit reasoned:

> [W]e first apply the ordinary tools of statutory interpretation to determine if "Congress has directly spoken to the precise question at issue." City of Arlington v. FCC, ___ U.S. ___, 133 S. Ct. 1863, 1868 (2013) (internal quotation marks omitted). If a statute's text answers the question, "that is the end of the matter." Id. (internal quotation marks omitted).
>
> Here, the Act expressly states that its new reimbursement standards take effect "on or after July 1, 2010." 42 U.S.C. § 1395ww(d)(5)(B)(iv), (h)(4)(E)(ii); ACA § 5504(a)(3), (b)(2). And the Act leaves in place the old standards for cost-reporting periods "beginning before July 1, 2010." 42 U.S.C. § 1395ww(h)(4)(E)(i); ACA § 5504(a)(1). By the plain terms of those provisions, therefore, the Act's new standards are not retroactive to [the hospital's] appeal for fiscal years 2002-2006.
>
> But [the hospital] argues that § 5504(c) governs the retroactivity issue here. That subsection provides: "The amendments made by this section shall not be applied in a manner that requires reopening of any settled hospital cost reports *as to which there is not a jurisdictionally proper appeal pending* as of" March 23, 2010. ACA § 5504(c) (emphasis added). [The hospital] reads this language implicitly to require the Department to reopen cost reports for which appeals *were* pending on March 23, 2010. And [the hospital's] appeals for fiscal years 2002-2006 were pending on that date. [The hospital] thus contends that the Department must reopen its cost reports for those years.
>
> That reopening would be futile, however, if the Department applied the same pre-ACA standards by which it denied reimbursement to [the hospital] in the first place. And the ACA expressly states that the pre-ACA standards apply to

the fiscal years at issue here (2002-2006) and that the ACA's new standards do not apply [to] those years.  See 42 U.S.C. § 1395ww(d)(5)(B)(iv), (h)(4)(E)(ii); ACA § 5504(a)(3), (b)(2).

But [the hospital] asks us to read a second implication into § 5504(c), namely, that the effective dates that Congress so plainly stated in § 5504(a) and (b) do not apply in appeals pending on the day the Act became law.  [The hospital] thus asks us to make two assumptions: first, as discussed above, that § 5504(c) implicitly requires the Department to reopen cost reports for which an appeal was pending on the date the Act became law; and second, that Congress wanted the Act's new standards to apply retroactively to those cost reports.  The first assumption—on which we take no position here—at least has some connection to the Act's text.  But the text expressly refutes the second:  §§ 5504(a) and (b) state in plain and categorical terms that the Act's new reimbursement rules do not apply to prior fiscal years, and that the old reimbursement rules do apply to those years.  Moreover, in the very next section of the ACA, Congress expressly made other parts of the Act retroactive.  See ACA § 5505(c).  That language in turn creates a negative implication of its own: that Congress did *not* want the Act's reimbursement rules to be retroactive, period.  Whatever one thinks of the first implication that [the hospital] reads into § 5504(c), therefore, the second is an implication too far.

[The hospital's] best argument is that, if we read the Act literally, § 5504(c) is superfluous.  Normally we try to avoid that result when construing statutory text.  Doe v. Boland, 698 F.3d 877, 881 (6th Cir. 2012).  And [the hospital] is correct that, if § 5504(c) does not require reopening here, then § 5504(c) probably does not do much of anything.  The Department, for its part, provides us little reason to think otherwise.  But again, reopening itself is not enough for [the hospital] to obtain any relief in this appeal; rather, it needs reopening plus retroactivity, which again § 5504(a) and (b) expressly forbid.  Meanwhile, the presumption against superfluous language is not absolute:  "There are times when Congress enacts provisions that are superfluous."  Microsoft Corp. v. i4i Ltd Partnership, ___ U.S. ___, 131 S. Ct. 2238, 2249, 180 L.Ed.2d 131 (2011) (internal quotation marks omitted).  For purposes of this case, we conclude that this is one of those times.

Finally, [the hospital] argues that an implementing regulation, 42 C.F.R. § 413.78, supports [the hospital's] reading of § 5504(c).  That regulation formerly said that § 5504(c)'s new standards "cannot be applied in a manner that would require reopening of settled cost reports, *except*

13

> *those cost reports on which there is a jurisdictionally proper*
> *appeal pending*" as of March 23, 2010.  79 Fed. Reg. 49854-
> 01, 50118 (2014) (emphasis added).  But the Department has
> since amended § 413.78, which now says that the new
> reimbursement standards do not apply to "[c]ost reporting
> periods beginning before July 1, 2010."  42 C.F.R.
> § 413.78(g)(6).  And a new version of a regulation supersedes
> the old version as soon as the agency adopts it in a final rule..
> Smiley v. Citibank, 517 U.S. 735, 741-42 (1996).  Thus, in
> summary, the Department's current interpretation is
> consistent with the statute.

Id. at 363-65.  That is a comprehensive treatment of EMMC's arguments here.

Moreover, even if I were to conclude that the statutory language is ambiguous (Covenant Medical Center did not), "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation."  Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).  Instead, under step two of Chevron, the question is "whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.  See also Rhode Island Hosp. 548 F.3d at 34.[12]  I need not conclude that the agency's interpretation of the statute is the *best* interpretation or "even the reading the court would have reached if the question initially had arisen in a judicial proceeding" in order to uphold the agency action.  Chevron, 467 U.S. at 843 n.11.  Nor does an agency need to "write a rule that serves the statute in the best or most logical manner; it need only write a rule that flows rationally from a permissible construction of the statute."  Strickland, 48 F.3d

---

[12] I note the very recent First Circuit decision, Del Grosso v. Surface Transp. Bd., No. 15-1069, slip op. at 3 (1st Cir. Feb. 5, 2015), holding that Chevron deference applies only when an interpretation "relate[s] to the agency's congressionally delegated administration of the statute, typically its exercise of regulatory authority."  See also United States v. Mead Corp., 533 U.S. 218, 234 (2001.)  That condition is satisfied here.

at 17.  "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail."  Chevron, 467 U.S. at 866.  The Secretary's reading of section 5504 and the implementing regulation—that the pre-ACA law sets the standards for cost reports before 2010 even for years still then on appeal—certainly satisfies Chevron step two.[13]

Because the Secretary's interpretation constitutes a "permissible construction of the statute," Chevron, 467 U.S. at 838, I conclude that the new standard of section 5504 of the ACA does not apply retroactively to EMMC's pending appeals of the 2003 and 2004 cost reports.

### (4) Pre-ACA Law Governing This Case

I now review the CMS Administrator's application of the contemporaneous law to the 2003 and 2004 cost reports.  As previously stated, the statute then allowed reimbursement if the hospital incurred "all, or substantially all of the costs for the training program in that [offsite] setting."   42 U.S.C. §§ 1395ww(d)(5)(B)(iv) (2003), 1395ww(h)(4)(E) (2004).  The regulations in effect in 2003 and 2004 required that the hospital demonstrate that it was "providing

---

[13] As Covenant Medical Center, Inc. v. Burwell, 360 F. App'x 364-65 (6th Cir. 2015) observed, the Secretary adopted clarifying amendments to the regulation in 2014.  See 42 C.F.R. § 413.78(g)(6) (2014).  This amended version of the regulation explicitly states that the Secretary will not apply the statute retroactively.  Although EMMC urges that the 2014 version of the regulation should not, itself, apply retroactively, "a new version of a regulation supersedes the old version as soon as an agency adopts it in a final rule."  Covenant Medical Center, 360 F. App'x At 364-65.  Because this new version of the regulation is merely a clarification of the Secretary's interpretation, it raises no retroactivity concerns.  See, e.g., Kutty v. U.S. Dep't of Labor, 764 F.3d 540, 547 n.5 (6th Cir. 2014); see also Liquilux Gas Corp. v. Martin Gas Sales, 979 F.2d 887, 890 (1st Cir. 1992) ("Clarification, effective *ab initio*, is a well recognized principle.").

reasonable compensation to the nonhospital sites for supervisory teaching activities." 42 C.F.R. §§ 413.86(f)(4)(ii) (2003), 413.78(d)(2) (2004). The Secretary allowed the use of volunteer outside teaching physicians, but required documentation concerning the nature of their compensation from the hospital or other sources as part of determining whether the hospital seeking Medicare reimbursement met the standard of incurring "all, or substantially all the costs." R. at 27-28. Here, the CMS Administrator found that because the EMMC agreements simply stated that nonhospital sites would not compensate EMMC and that the sites agreed to voluntarily supervise residents without compensation from EMMC, there was not enough information in the agreements to "clearly indicate" that EMMC was incurring "all, or substantially all, of the costs for the training program." Id. EMMC argues that the statute does not support the Secretary's requirements of a written agreement, reasonable compensation to an outside physician, specification in the agreement about the outside physician's compensation, or that the agreement must be signed before the outside rotation begins.

Once again, the Sixth Circuit has grappled with some of these issues with the same hospital that raised a challenge in the other Sixth Circuit case I have cited. In an earlier case, Covenant Medical Center, Inc. v. Sebelius, 424 F. App'x 434 (6th Cir. 2011), the Sixth Circuit said:

> [The hospital] urges us to conclude that the written agreement requirement exceeds the Secretary's authority. Under the relevant statute, [the hospital] points out, Congress directed the Secretary to count "*all* the time" a resident spends in patient care toward a hospital's FTE count "if the hospital incurs all, or substantially all, of the costs for

the training program." 42 U.S.C. § 1395ww(h)(4)(E) (emphasis added). The statute thus imposes just two requirements—that residents must engage in patient care and that the hospital must incur all or substantially all of the costs—and beyond that, [the hospital] urges, the Secretary may not impose any additional preconditions to reimbursement, including a written agreement requirement.

But the Secretary could permissibly conclude that a written agreement is not a new substantive requirement but a procedural mechanism for satisfying the two statutory requirements. Congress gave the Secretary authority to "establish rules consistent with [§ 1395ww(h)(4)] for the computation of the number of full-time-equivalent residents in an approved medical residency training program," id. § 1395ww(h)(4)(A), and the written agreement requirement comfortably fits within that grant of authority under Chevron. "Regulation, like legislation, often requires drawing lines." Mayo Found. For Med. Educ. & Research v. United States, ___ U.S. ___, 131 S. Ct. 704, 715, 178 L.Ed.2d 588 (2011). The Secretary reasonably determined that the written agreement requirement "would improve administrability, and thereby . . . avoid [ ] the wasteful litigation and continuing uncertainty that would inevitably accompany a purely case-by-case approach," id. (citations and quotation marks omitted), for determining whether a hospital "incurs all, or substantially all, of the costs for [a particular] training program, 42 U.S.C. § 1395ww(h)(4)(E).

Chevron supports this conclusion. At step one of Chevron, we ask whether Congress spoke directly to the issue at hand. Sierra Club v. EPA, 557 F.3d 401, 405 (6th Cir. 2009). In this instance it did not, as Congress said nothing in § 1395ww(h)(4)(A) or (h)(4)(E) about the documentation the Secretary may require. Elsewhere, moreover, Congress endorsed the Secretary's authority to insist on documentation before reimbursement, providing that "no . . . payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider . . . for the period with respect to which the amounts are being paid or any prior period." 42 U.S.C. 1395g(a).

That § 1395ww(h)(4)(E) requires the Secretary to reimburse "all the time" spent in patient care, contrary to [the hospital's] position, does not prohibit the Secretary from imposing documentation requirements for establishing what time was spent in patient care and for proving that the other conditions for reimbursement were met. Otherwise, the Secretary would be severely handicapped in administering

17

the program.  Under [the hospital's] reading, she could not require hospitals to submit reimbursement requests *before* receiving payment because, if she did, she would not end up including "all the time" spent in patient care, only the requested time.  Likewise, under [the hospital's] reading, she could not require hospitals to submit their documentation electronically, make them meet deadlines or impose any other requirement that might lead to crediting less than "all the time."  Section 1395ww(h)(4)(E) says nothing about these sorts of procedural requirements, and accordingly the statute does not preclude the Secretary from imposing them.

At step two of <u>Chevron</u>, we ask whether the Secretary's interpretation—establishing a written agreement requirement—reasonably construes the statute.  <u>Sierra Club</u>, 557 F.3d at 405.  The Secretary may specify the documentation hospitals must submit, 42 U.S.C. § 1395g(a), and the written agreement does just that. . . .  It was reasonable for the Secretary to conclude that § 1395ww(h)(4)(E) did not prohibit it.

Through it all, [the hospital] may well have intended to comply with the Secretary's FTE regulations and simply did not know about the written agreement requirement until after the fact.  But that does not save it.  "Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."  <u>Fed. Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380, 384-85, 68 S. Ct. 1, 92 L.Ed. 10 (1947); <u>see also</u> 44 U.S.C. § 1507.  "As a participant in the Medicare program, [the hospital] had a duty to familiarize itself with the legal requirements for cost reimbursement."  <u>Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.</u>, 467 U.S. 51, 64, 104 S. Ct. 2218, 81 L.Ed. 2d 42 (1984).  Because the written agreement requirement legitimately applied to [the hospital] and because the Secretary permissibly concluded that [the hospital] did not meet it, the Secretary's final decision must be upheld.

<u>Id</u>. at 438-39.  Again, "common sense and comity" suggest that I follow this reasoning by Sixth Circuit Judge Sutton.  I uphold the Secretary's requirement of a written agreement as reasonable.

I add the following observations concerning some of EMMC's specific arguments that the <u>Covenant Medical Center</u> opinion does not address.  EMMC

argues that from 1987 until 1999, the Secretary interpreted the "all, or substantially all" language in the statute that allowed Medicaid reimbursement of direct costs as requiring only that the hospital pay the resident's salary and benefits, nothing more.  Pl.'s Mot. at 37.  It attacks, therefore, any later demand by the Secretary that compensation of outside physicians be specified, any requirement of written agreements between EMMC and the outside teaching physicians, and any requirement that such agreements must be executed before the outside rotation begins.  It argues that in light of the earlier interpretation, the Secretary's 1998 regulation enlarging the inquiry beyond the payment of the residents' stipends and fringe benefits and requiring, for the first time, documentation of compensation arrangements with the outside teaching physician as part of showing that the hospital was incurring "all or substantially all, of the costs for the training program" should not be afforded deference.[14]  Id. at 37-39; Pl.'s Reply at 7-15 (ECF No. 24).  In addition to the Sixth Circuit's persuasive reasoning upholding the written agreement requirement, I observe

---

[14] The 1998 regulation, effective January 1, 1999, added a requirement for Medicare reimbursement, such that the hospital had to pay the residents' salaries and fringe benefits and in addition "the portion of the cost of teaching physicians' salaries and fringe benefits attributable to direct graduate medical education," 42 C.F.R. § 413.86(b)(3)(1998), and it added the requirement that a written agreement state that "the hospital is providing reasonable compensation to the nonhospital site for supervisory teaching activities" and "indicate the compensation the hospital is providing to the nonhospital site for supervisory teaching activities." 42 C.F.R. § 413.86(f)(4)(ii)(1998).  EMMC argues that the Secretary did not adopt the policy on volunteer teaching physicians until 2005, after the fiscal years in question, Pl.'s Mot. at 40-41, that the Secretary did so based on the FAQ section of her website, Pl.'s Reply at 11-12, that the FAQ was an interpretation of a preamble found at 69 Fed. Reg. 48916, 49178 (Aug. 11, 2004), id., that this was an "interpretation of an interpretation of an interpretation," id. at 12, and that it therefore should not be afforded deference.  The record is to the contrary.  See 63 Fed. Reg. 40,996 (July 31, 1998); R. at 2,436-37 (Program Memorandum A-98-44 (HCFA Pub. 60A) (Dec. 1998)); 64 Fed. Reg. 59,185 (Nov. 2, 1999) (notifying the public of the adoption of various items, including the Program Memorandum).

that the Secretary broadened the cost inquiry and adopted the documentation requirement when Congress amended the Medicare law to add indirect costs to the direct costs for which hospitals could claim Medicare reimbursement for outside rotations, and after substantial experience in administering the Medicare reimbursement provision for direct costs.  <u>See</u> Balanced Budget Act of 1997, Pub. L. 105-33, § 4621(b)(2), codified at 42 U.S.C. § 1395ww(d)(5)(iv); 42 C.F.R. § 413.86(b) (1998).  EMMC argues that because the Secretary had been requiring only that a hospital pay the residents' stipend and fringe benefits under the direct cost reimbursement statute that referred to "all, or substantially all" of the costs, when Congress enlarged the reimbursement formula to consider indirect costs and repeated the "all, or substantially all" language, it effectively codified the Secretary's previous interpretation of that language.  I disagree.  The phrase obviously cries out for flexible administrative interpretation that can develop with changing practices and insights that come from experience.  Contrary to EMMC's argument, broadening the inquiry and adding the documentation requirement was a legitimate administrative protection against double counting and did not contradict congressional intent.[15]  Several courts have upheld the requirement. <u>See, e.g.</u>, <u>Kingston Hosp. v. Sebelius</u>, 828 F. Supp. 2d 473, 478 (N.D.N.Y. 2011); <u>Borgess Medical Center v. Sebelius</u>, 966 F. Supp. 2d 1, 8 (D.D.C. 2013); <u>Chestnut Hill Hosp. v. Thompson</u>, 2006 WL 2380660 at *5 (D.D.C. 2006).

---

[15] <u>See, e.g.</u>, 63 Fed. Reg. 40,987 (Feb. 11, 1998) ("[T]he potential for both the hospital and the qualified nonhospital provider to be paid for the same direct GME expenses poses a significant problem for complying with section 1886(h)(3)(B) of the Act, as amended by the BBA, which specifically prohibits double payments.").

EMMC also argues that the written agreement requirement should not be enforced at all because in 2004 the Secretary promulgated a regulation allowing for an alternative to the written agreement beginning in October of that year, *i.e.*, for the fiscal year 2005.  Pl.'s Mot. at 41-42.  EMMC provides no authority for retroactive application of the new regulation and no basis to argue that its promulgation made the previous written agreement requirement *ipso facto* arbitrary.  Id.

Next, EMMC argues that even if the Secretary's regulation requiring a written agreement deserves deference, the court should not defer to her interpretation that the written agreement must be fully executed before a resident's outside rotation begins.  Pl.'s Mot. at 42.  I disagree.  First, a rule about the timing of the agreement fits well within the <u>Covenant Medical Center</u> court's analysis that this is all part of the Secretary's authority to establish rules for computing numbers of eligible residents for the medical residency training program as part of a procedural mechanism for satisfying the statutory requirements.  <u>See</u> 424 F. App'x at 438-39.  Second, the regulation in place in 2003 and 2004 stated:

> [T]he written agreement between the hospital and the nonhospital site must indicate that the hospital will incur the cost of the resident's salary and fringe benefits while the resident is training in the nonhospital site and the hospital is providing reasonable compensation to the nonhospital site for supervisory teaching activities. . . .  The agreement must indicate the compensation the hospital is providing to the nonhospital site for supervisory teaching activities.

42 C.F.R. §§ 413.86(f)(4)(ii) (2003), 413.78(d)(2) (2004).  That language is inconsistent in describing whether the requisite agreement controls future or

present arrangements.  ("[T]he written agreement between the hospital and the nonhospital site must indicate that the hospital *will* incur the cost . . ."; "The agreement must indicate the compensation the hospital *is providing* to the nonhospital site for supervisory teaching activities.").  As the Supreme Court has taught us, courts "must give substantial deference to an agency's interpretation of its own regulations."  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  The "task is not to decide which among several competing interpretations best serves the regulatory purpose," but to "defer to the Secretary's interpretation unless 'an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'"  Id. (quoting Gardenbring v. Jenkins, 485 U.S. 415, 430 (1988).  It was reasonable, therefore, for the Secretary here to choose an interpretation of her regulation that requires the agreement to be executed in advance of the outside rotation.   I also find persuasive the Secretary's argument that her interpretation upholds the regulation's purpose of ensuring that all parties know of the financial obligations before entering into a relationship, to avoid disputes about costs after the relationship has begun, and to prevent double payments from being made.  Def.'s Mot. for J. on the Admin. R. (ECF No. 22) ("Def.'s Mot.") at 41.  As the court said in Univ. Med. Ctr., Inc. v. Sebelius, 856 F. Supp. 2d 66, 83 (D.D.C 2012), on this precise issue, "the Secretary's interpretation of the regulation's text is plausible and the preamble accompanying the regulation confirms her interpretation, both implicitly and more directly.  Hence, this is a setting where the Secretary's interpretation of her regulation must receive

substantial deference under <u>Thomas Jefferson University</u>." The Secretary's decision to adopt explicitly her longstanding interpretation of the regulation by amending it in 2007 does not change my analysis. I conclude that disqualifying outside rotations where the written agreement was not signed in advance was proper.[16]

EMMC's final argument is that substantial evidence in the administrative record does not support the CMS Administrator's decision. EMMC bases this argument on its assertion that the CMS Administrator "relied solely upon [the Fiscal Intermediary's] summaries," that the summaries "do not tie back to the individual Disallowed Rotations, so it is impossible to test or confirm the Secretary's findings," that language in a column heading in the summaries is not accurate,"[17] and that that the "Decision fails to even independently discuss the voluminous documentation that EMMC provided . . . ." Pl.'s Mot. at 44.

---

[16] As footnote 5 observes, the Medicare Modernization Act of 2003 included a one-year moratorium that instructed the Secretary to allow hospitals to count residents in outside rotations "without regard to the financial arrangement between the hospital and the teaching physician practicing in the non-hospital site." Pub. L. 108-173, § 713(a), 117 Stat 2066. The Secretary did not interpret the moratorium to allow for written agreements to be discarded altogether. R. at 29. While EMMC does not explicitly challenge this interpretation in its Motion for Judgment on the Administrative Record or in its Reply, it implies that it disagrees by stating that the Secretary ignored Congress's "hint" of enacting the 2004 moratorium when it "created additional, unnecessary hoops for hospitals to jump through." Pl.'s Mot. at 32. I agree with the <u>Kingston Hosp. v. Sebelius</u> court that found the Secretary's reading of the moratorium was reasonable under <u>Chevron</u> deference. 828 F. Supp. 2d 473, 480 (N.D.N.Y. 2011) ("To the limited extent that the statute may be construed as ambiguous, the Secretary's reading of it is eminently reasonable.").

[17] The heading in the original summaries was: "Agreement but noted as volunteer (salaried-identified by provider)." R. at 383 and 1,410. But what the CMS Administrator's decision referred to was a page of the Fiscal Intermediary's post-hearing memorandum, and it altered the language of the heading to: "Agreement, Noted as volunteer but identified by Provider as Salaried or Compensation basis unknown." Page 2 of the Fiscal Intermediary's Post Hearing Memorandum, dated February 12, 2013, R. at 87. That Post Hearing Memorandum also changed the numbers populating the tables. The witness for the Fiscal Intermediary testified in her deposition about the column as worded in the original tables: "[T]he description here[,] it says, salary identified by Provider, but it was really all those that we didn't identify as a volunteer." R. at 175.

I am not persuaded by EMMC's argument.  EMMC bases its argument on a footnote in the decision that states: "See p. 2 of the Intermediary's Post Hearing Memorandum, dated February 12, 2013 for the Intermediary's breakdown of the remaining [rotations] involved in this case."  R. at 28 n.2.  The "p. 2" referred to in the Administrator's decision is in the Administrative Record at 87 and contains tables similar to those referred to by EMMC, which are in the Administrative Record at 383 and 1,410.  I understand the footnote to refer to the categorizations that the Fiscal Intermediary used and the CMS Administrator adopted.  In fact, the numbers populating the table had changed and, to some degree, so did one of the category headings.  The footnote does not suggest that the CMS Administrator adopted the substance of what the Fiscal Intermediary had claimed in the tables.  The CMS Administrator's decision on substance comes from the text of the decision, and it states:

> The record shows that the disallowed [rotations] involved written agreements that were signed by the parties after the non-provider rotation started, or not signed at all by the supervising physician; instances where there was no written agreement at all; written agreements noting that the physician was a volunteer, but where the physician was identified by the Provider as salaried, or the compensation basis was not specified; instances where the resident was away and no rotation took place, and instances where there was no name of a resident matched to a teaching physician, or the teaching physician name was missing from rotation schedule.

Id. at 28.  Nothing in the CMS Administrator's decision indicates that it "relied solely" on the one-page summaries submitted by the Fiscal Intermediary.  Quite the contrary.  The decision states that the CMS Administrator examined "[t]he entire record," "including all correspondence, position papers, exhibits, and

subsequent submissions." Id. at 13.   Later it states that although some agreements were written, "in other instances, no written agreement has been produced.  Additionally, several of the agreements were dated after the agreed upon period of supervision had already started." Id. at 24.   For the latter statement it adds a footnote that refers to specific exhibits. Id. at 24 n.33.   It would not be possible for the Administrator to describe the rotations at issue in as much depth as it does by relying only on the one-page summaries.  Nothing in the final decision suggests that the CMS Administrator is disingenuous in its claim to have examined the entire record and all timely-submitted comments. Finally, EMMC has provided no specific argument to this court as to how its documentation of any given rotation actually met the challenged requirements that I now have upheld.  I conclude that substantial record evidence supports the final decision and that the footnote reference does not suggest that the CMS Administrator ignored the record evidence or that the decision was arbitrary or capricious.

## CONCLUSION

The Medicare Act and its accompanying regulations are long and complex, and hospitals obviously have to surmount many administrative hurdles that must seem distracting from their primary mission of patient care and training skilled doctors.   However, the Secretary's interpretation of the applicable statutes and regulations here is not unreasonable under Chevron and is supported by substantial record evidence.   Therefore, the Secretary's Cross-

Motion for Judgment on the Administrative Record is **GRANTED**, and EMMC's Cross-Motion for Judgment on the Administrative Record is **DENIED**.

> **SO ORDERED.**
>
> **DATED THIS 9TH DAY OF FEBRUARY, 2016**

/S/D. BROCK HORNBY

**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**